IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Sherry W.,[1] | ) | C/A No.: 1:21-2234-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Sherri A. Lydon, United States District Judge, dated January 5, 2022, referring this matter for disposition. [ECF No. 16]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 14].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On December 3, 2015, Plaintiff protectively filed an application for DIB in which she alleged her disability began on June 19, 2015. Tr. at 146–52. Her application was denied initially and upon reconsideration. Tr. at 95–98, 102–06. On July 12, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Nicole Forbes-Schmitt. Tr. at 36–57 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 15, 2018, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–23. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 22, 2021. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 62 years old at the time of the hearing. Tr. at 40. She completed high school and an associate degree in computer technology. *Id.* Her past relevant work ("PRW") was as a mortgage broker and a vocational instructor. Tr. at 53–54. She alleges she has been unable to work since June 19, 2015. Tr. at 41.

2.    Medical History

Plaintiff presented to her primary care physician ("PCP"), George A. Butler, M.D. ("Dr. Butler"), on June 12, 2015. Tr. at 315. She indicated she had quit her job in September 2014 to care for her mother, who had suffered a stroke. *Id.* She reported she had returned to work after her mother passed away in April 2015, but was struggling with grief. *Id.* Dr. Butler noted Plaintiff demonstrated somewhat sad affect, but was cooperative, non-suicidal, had appropriate mood and affect and normal judgment, and was not tearful. Tr. at 318. He assessed hypertension, hyperlipidemia, insulin resistance, anxiety disorder, and bereavement, and he increased Buspar from 10 mg to 15 mg twice a day. Tr. at 315, 318.

On September 4, 2015, Dr. Butler noted normal findings on physical exam, aside from bilateral nasal congestion, mildly antalgic gait, and somewhat sad affect. Tr. at 312–13. He continued Plaintiff's medications and

3

indicated he would arrange a rheumatology consultation, as Plaintiff reported pain at many sites. Tr. at 310, 313.

Plaintiff presented to rheumatologist Ashrito K. Dayal, M.D. ("Dr. Dayal"), for evaluation of diffuse arthralgias and myalgias on September 16, 2015. Tr. at 293. She reported a 30-year history of whole-body pain in the joints of her back and upper and lower extremities, mostly on the right side. *Id.* She indicated her symptoms had increased over time. *Id.* Dr. Dayal noted a detailed review for extraarticular manifestations of inflammatory synovitis, systemic lupus erythematosus, rheumatoid arthritis, and vasculitis was negative. *Id.* He indicated Plaintiff had no history of inflammatory eye, skin, or bowel disease and no history of chronic infection of hepatitis. *Id.* Plaintiff endorsed poor sleep, anxiety, sadness, crying spells, memory and concentration problems, irritability, social isolation, fatigue, and tiredness. Tr. at 294. She said she attempted to walk three times a week for 30 minutes to an hour each time. *Id.* She described pain in her right hip, lower back, feet, ankles, and wrists as an eight on a 10-point scale. *Id.* Dr. Dayal observed Plaintiff to be questionably anxious and depressed, to have tenderness over the first carpometacarpal ("CMC") joints bilaterally, to have crepitus in the right upper extremity, to demonstrate hallux valgus with a mildly tender bunion on the right foot, to have non-focal diffuse tenderness of the dorsal surfaces of the feet more pronounced on the right, to have bilateral knee

crepitus more pronounced on the right, to show mild tenderness in the right trochanteric area, and to have a few scattered tender points over the upper back and paraspinal areas. *Id.* He indicated x-rays of the lumbar spine showed very mild degenerative changes and facet arthropathy. Tr. at 295. He assessed generalized osteoarthritis of the lumbar spine, knee joints, and hands and possible secondary fibromyalgia-like syndrome. *Id.* He prescribed Lexapro 10 mg and ordered a sleep study and x-rays of Plaintiff's knees and feet. *Id.*

On September 30, 2015, Plaintiff reported she had stopped Lexapro for a few days due to nausea. Tr. at 290. She complained of right upper hip and back pain and less severe knee pain that caused her to minimize her walking. *Id.* She rated her pain as a nine. Tr. at 291. Dr. Dayal noted very minimal tenderness in Plaintiff's hands and wrists, mild tenderness over her metatarsophalangeal ("MTP") joints, crepitus and minimal tenderness in her knee joints, tenderness in her right trochanteric area, and tender points over her neck, back, lateral thighs, and lower paraspinal areas. *Id.* He reviewed lab studies that showed erythrocyte sedimentation rate of 8, uric acid of 6.6, C-reactive protein less than 0.5, creatinine phosphokinase of 162, and negative rheumatoid factor. *Id.* He also noted x-rays of Plaintiff's knee joints showed narrowing bilaterally, right more than left, with tricompartmental degenerative disease. Tr. at 292. He stated x-rays of Plaintiff's feet showed

osteoarthritis of the first MTP joints bilaterally and inferior and posterior calcaneal spurring. *Id.* He assessed: (1) generalized osteoarthritis with involvement of the lumbar spine, knee joints, and hands; (2) osteoarthritis of the knee joints; (3) right trochanteric bursitis; and (4) fibromyalgia syndrome. *Id.* He prescribed Lexapro for fibromyalgia, advised cushioned and supportive footwear, and indicated he would consider knee and hip injections. *Id.*

Plaintiff reported improvement with use of Lexapro on October 22, 2015. Tr. at 306. Dr. Butler noted mildly-antalgic gait, bilateral nasal congestion, somewhat sad affect, and no significant joint swelling. Tr. at 308. He continued and refilled Plaintiff's medications. Tr. at 309.

On November 4, 2015, Plaintiff reported significant improvement in her fatigue and mental functioning with Lexapro. Tr. at 287. She endorsed ongoing widespread body pain, but denied new joint pain, stiffness, and swelling. *Id.* She indicated she was doing some walking and yoga a few times a week. Tr. at 288. She noted she felt tired, but was better able to manage. *Id.* She continued to report sleep disturbance and rated pain in her right arm, hip, and leg as a nine. *Id.* Dr. Dayal noted non-focal diffuse tenderness of the feet without swelling, crepitus in the knee joints with minimal tenderness on the right, right trochanteric tenderness, and multiple extensive tender points with more on the right than left. *Id.* He continued Lexapro 10 mg and Cyclobenzaprine 10 mg. *Id.*

Plaintiff complained of moderate, worsening snoring on November 18, 2015. Tr. at 271. She endorsed anxiety, fatigue, and irritability. *Id.* Ramarao Suresh, M.D. ("Dr. Suresh"), recommended further evaluation for obstructive sleep apnea ("OSA") through a home sleep test. Tr. at 274.

Plaintiff underwent a sleep study on December 21, 2015. Tr. at 555. It showed a respiratory event index ("REI") of 13.2 and 86% oxygen saturation. *Id.* Dr. Suresh ordered an auto-titrating continuous positive airway pressure ("CPAP") machine. Tr. at 556.

On January 14, 2016, Dr. Butler completed a form at the request of the Social Security Administration ("SSA"). Tr. at 603. He noted Plaintiff was taking Cymbalta for major depression, which helped her condition. *Id.* He confirmed psychiatric care had been recommended with referral to Dr. Valite in Indian Land, South Carolina. *Id.* He described Plaintiff's mental status as: oriented to time, place, person, and situation; slowed thought process; appropriate thought content; depressed mood/affect; fair to poor attention/concentration; and adequate memory. *Id.* He considered Plaintiff capable of managing funds. *Id.*

On January 21, 2016, Dr. Butler noted Plaintiff had mildly-antalgic gait and somewhat sad affect, but no significant joint swelling and was not tearful. Tr. at 397. He refilled Plaintiff's medications. Tr. at 398.

On February 16, 2016, Plaintiff reported her regular use of the CPAP machine had improved her sleep quality. Tr. at 267. She stated she awoke refreshed, her cough had improved, and her daytime sleepiness had resolved. *Id.* Dr. Suresh stated no CPAP titration was required. Tr. at 270.

On February 17, 2016, Plaintiff denied walking and other exercise. Tr. at 83. She reported improved pain level with occasional flares. Tr. at 284. Dr. Dayal noted mostly normal findings on physical exam, except for minimal ankle tenderness without synovitis, knee joint crepitus, and multiple tender points with some improvement over the prior visit. Tr. at 285. He continued Lexapro 10 mg and Cyclobenzaprine 10 mg. *Id.*

Plaintiff presented to Chad Ritterspach, Psy.D. ("Dr. Ritterspach"), for a consultative psychological evaluation on March 26, 2016. Tr. at 257–59. She endorsed depressed mood on most days, low energy, low motivation, disturbance of appetite and sleep, loss of interest in activities she formerly enjoyed, social withdrawal, and short-term memory problems. Tr. at 257. In discussing her work history, Plaintiff denied problems with tardiness, absenteeism, remembering instructions, conflict with supervisors and coworkers, and accepting feedback from supervisors. *Id.* She said she was "OK" at following directions and endorsed activities that included washing and ironing clothes, shopping for groceries, watching television, attending Bible study, preparing and picking up meals, reading, writing, handling self-

care, driving, and sweeping the floor. Tr. at 258. Dr. Ritterspach recorded mostly normal observations on mental status exam ("MSE"). *Id.* However, he noted Plaintiff completed four of five serial threes and initially recalled one of three words after a delay and the other two after receiving a hint. *Id.* He indicated Plaintiff "did not display severe impaired memory during the MSE despite having the stroke" and "did not report significant impairment related to" the activities of daily living ("ADLs") she completed. *Id.* He assessed adjustment disorder with depressed mood and bereavement. *Id.* Dr. Ritterspach considered Plaintiff capable of completing basic ADLs, interacting appropriately with coworkers, supervisors, and the public, and protecting herself from workplace safety hazards. *Id.* He stated Plaintiff's verbal reasoning and mathematical skills suggested she had "the ability to understand, retain and follow simple, work-related directions," but that "[d]ue to depression," she "may have mild problems tolerating work-related stressors, and she may be somewhat easily distracted from work tasks if they are detailed and complex." *Id.* He wrote: "Overall, she should be capable of attending to and performing work tasks reasonably well as long as the tasks are simple and routine in nature." *Id.* He did not believe Plaintiff required assistance in managing her funds in her own best interest. *Id.*

On March 28, 2016, state agency medical consultant Carl Anderson, M.D. ("Dr. Anderson"), assessed Plaintiff's physical residual functional

9

capacity ("RFC") as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and frequently balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds. Tr. at 86–88. A second state agency medical consultant, George Walker, M.D. ("Dr. Walker"), assessed the same physical RFC on August 26, 2016. *Compare* Tr. at 69–71, *with* Tr. at 86–88.

On March 30, 2016, state agency psychological consultant Timothy Laskis, Ph.D. ("Dr. Laskis"), reviewed the record and completed a psychiatric review technique. Tr. at 84–85. He considered Listing 12.04 for affective disorders and assessed no restriction of ADLs or repeated episodes of decompensation, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* He considered Plaintiff moderately limited in her abilities to carry out detailed instructions and maintain attention and concentration for extended periods. Tr. at 88. He wrote:

> She can understand, retain and follow simple instructions and can concentrate well enough to complete simple tasks w/o supervision. She would have moderate difficulty with more detailed instructions and complex tasks. She could complete a normal work week with an occasional interruption due to her mental condition. She can interact appropriately w/ co-workers, supervisors, and the public. She is able to avoid common, work-related dangers.

10

Tr. at 89. A second state agency psychological consultant, Douglas Robbins, Ph.D. ("Dr. Robbins"), provided the same opinion on August 24, 2016. *Compare* Tr. at 66–67 *and* 71–72, *with* Tr. 84–85 *and* 88–89.

On April 20, 2016, Plaintiff complained of ongoing dizziness for several weeks. Tr. at 509. Physician assistant Cyril G. Varlack prescribed Antivert 25 mg. Tr. at 514.

On May 17, 2016, Plaintiff reported a one-year history of occasional lightheadedness and bilateral foot pain that was worsened by walking and prolonged standing. Tr. at 515. Alfred E. Kendrick, M.D., recorded normal findings on physical exam. Tr. at 518–19. He recommended Plaintiff wear thick-soled shoes and follow up with her PCP. Tr. at 519.

Plaintiff presented to Dr. Dayal for routine follow-up on August 31, 2016. Tr. at 281. She described increasing pain over her entire body, but most pronounced on her right side, and rated it as a 10. *Id.* Dr. Dayal noted extensive tender points over the neck, back, and paraspinal areas, but no other abnormalities on physical exam. Tr. at 282. He reviewed x-rays of Plaintiff's feet that showed small plantar calcaneal spurs and an early Achilles tendon spur. *Id.* He increased Lexapro to 20 mg daily to address fibromyalgia/chronic pain syndrome and continued Cyclobenzaprine 10 mg at bedtime for sleep disturbance and muscle spasms. *Id.*

Plaintiff presented to Carolinas HealthCare Urgent Care complaining of a three-week history of right foot pain on October 2, 2016. Tr. at 447. James Philip Griggs, M.D., noted hallux valgus deformity to the right foot, tenderness over the calcaneal area, and tenderness over the plantar fascia. Tr. at 450. He assessed plantar fasciitis, prescribed Mobic, and instructed Plaintiff to follow up with a podiatrist. Tr. at 451.

Plaintiff reported pain in her bilateral feet on November 22, 2016. Tr. at 473. She described deformity and worsening pain in the medial eminence and heel of her right foot, aggravated by shoes and weight-bearing. *Id.* Chason S. Hayes, M.D. ("Dr. Hayes"), observed tenderness over the first MTP joints of both feet, tenderness over the plantar fascia of the right foot, hallux valgus deformity passively correctable to neutral, normal range of motion ("ROM"), normal stability, normal motor and tendon function, no swelling, no masses, no crepitus, normal vascular pulses, and normal neurological findings. Tr. at 474. He assessed acquired hallux valgus of the bilateral feet and right plantar fasciitis, ordered a plantar fascia splint and physical therapy, and prescribed Meloxicam. Tr. at 475.

On December 20, 2016, Dr. Hayes observed mostly normal findings, except for bilateral hallux valgus deformity passively correctable to neutral, tenderness over the bilateral first MTP joints, and tenderness over the right plantar fascia. Tr. at 447. He counseled Plaintiff on stretching and modified

shoe wear, continued Meloxicam, and administered injections to the right plantar fascia bursa. Tr. at 477–78.

Plaintiff complained of a recent flare of right ankle pain on January 9, 2017. Tr. at 441. She also endorsed back pain, cramping in her fingers and toes, and occasional headaches. *Id.* Dr. Butler recorded the same observations he had noted during prior exams. Tr. at 444. He ordered lab studies and refilled Plaintiff's medications. Tr. at 445.

On February 2, 2017, Plaintiff requested an orthopedic boot for plantar fasciitis. Tr. at 461. Physician assistant Antoine J. Carey informed Plaintiff his office did not provide orthopedic boots and suggested she follow up with the podiatrist. *Id.*

Dr. Hayes's observations were consistent with prior exams during Plaintiff's February 14, 2017 visit. Tr. at 480. He placed Plaintiff in a walking boot and indicated she might require a bunionectomy. Tr. at 481.

Plaintiff reported regular CPAP use and excellent sleep quality on February 16, 2017. Tr. at 493. She denied daytime sleepiness. *Id.* Dr. Suresh noted Plaintiff had 100% compliance with CPAP and her REI had decreased to 4.8 from a baseline of 13.2. Tr. at 496. He recommended no changes to Plaintiff's CPAP settings and instructed her to follow up in a year. *Id.*

On March 1, 2017, Plaintiff reported doing well and indicated Lexapro had helped. Tr. at 582. She continued to endorse diffuse pain, especially over

her low back and right foot. *Id.* She was concerned about weight gain and noted she was going to the gym and exercising. *Id.* She indicated she tried to stay active. Tr. at 583. She noted her stress-related depressive features had improved. *Id.* Dr. Dayal observed a few scattered tender points over the neck and back, but otherwise recorded normal findings. *Id.* He prescribed Lexapro 20 mg for fibromyalgia/chronic pain syndrome and Cyclobenzaprine for sleep disturbance and muscle spasms. *Id.* He recommended Plaintiff continue to use the CPAP machine and supportive footwear. *Id.*

On March 16, 2017, Plaintiff reported no significant improvement in energy, despite using her CPAP machine nightly. Tr. at 435. She complained of occasional headaches and cramping in her fingers and toes. *Id.* Dr. Butler's observations were consistent with prior exams. Tr. at 438. He indicated Plaintiff should follow up with the orthopedic surgeon as to right ankle pain and continue her chronic medications. Tr. at 439. Plaintiff declined a Kenalog injection. *Id.*

On March 24, 2017, Plaintiff described pain on the lateral side of her right foot she rated as an eight. Tr. at 482. Physical therapist Bartosz Nikiciuk noted Plaintiff walked with antalgic gait and had pain on weight-bearing. *Id.* He found tenderness to palpation of the right heel, intact sensation, no edema, and normal flexibility and joint mobility. Tr. at 483. He recommended two sessions per week for six weeks. *Id.*

On April 10, 2017, Plaintiff complained of swelling in her bilateral feet and pain in her right foot that had caused her to fall and injure her right thumb, index finger, and hand two weeks prior. Tr. at 430. Dr. Butler noted somewhat sad affect, mildly-antalgic gait, and mild swelling of the bilateral legs, right greater than left. Tr. at 433. He refilled Meloxicam and instructed Plaintiff to continue her other medications. Tr. at 434.

Plaintiff requested a new orthopedic boot on May 30, 2017. Tr. at 485. Dr. Hayes's observations were consistent with prior exams. Tr. at 486. He advised Plaintiff she needed to have her bunions corrected, but she declined the procedure. Tr. at 487. He continued Meloxicam and prescribed orthopedic shoes with extra wide toe boxes and custom-molded Plastizote arch support inserts. *Id.*

On August 4, 2017, Plaintiff reported improved sleep since starting Ativan at night. Tr. at 425. She complained of occasional periods of anxiety. *Id.* Dr. Butler noted normal findings on physical exam, aside from mildly-antalgic gait with mild swelling of both legs, right greater than left. Tr. at 428. He noted normal findings on MSE, except that Plaintiff had a somewhat sad, but not tearful, affect. *Id.* He continued Plaintiff's chronic medications and indicated she should follow up with her orthopedic surgeon and rheumatologist. Tr. at 429.

On November 3, 2017, Dr. Butler noted Plaintiff's hemoglobin A1C had decreased to 5.9% since she started Metformin in August. Tr. at 416. He observed mildly-antalgic gait with mild swelling of both legs, right greater than left, but no calf tenderness or significant joint swelling. Tr. at 419. He noted Plaintiff had a somewhat sad affect, but was not tearful. *Id.* He performed extensive diabetes education, continued Plaintiff's medications, and noted he would take over prescribing Lexapro from Dr. Dayal. Tr. at 420–21.

On February 20, 2018, Plaintiff reported using her CPAP machine regularly with excellent sleep quality and no daytime sleepiness. Tr. at 504. She complained of significant headaches on a regular basis, unstable gait, and impaired vision. *Id.* Dr. Suresh noted 100% CPAP compliance with REI decreased to 5.2. Tr. at 507. He opined that Plaintiff's headaches were likely related to glaucoma and visual field defects. *Id.* He recommended she consult with an ophthalmologist as to headaches and impaired vision, a neurologist as to unstable gait, and an ear, nose, and throat specialist as to sinus problems. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on July 12, 2018, Plaintiff testified she had worked as a mortgage broker for about four years. Tr. at 41. She stated she subsequently worked as a substitute teacher and a computer lab instructor for Lancaster County School District. *Id.* She denied having worked since June 19, 2015. *Id.*

Plaintiff testified her ability to work was limited by her difficulty remembering things, including students' names during her last employment. Tr. at 42. She said she experienced pain in her back and legs due to fibromyalgia. *Id.* She stated she had swelling in her feet and ankles. *Id.* She noted decreases in her blood sugar caused her to feel tired. *Id.* She said she had difficulty focusing, felt confused, and became lost while driving. *Id.* She indicated her doctor had recommended she take Vitamin D for memory problems. *Id.*

Plaintiff described pain in her hip, back, feet, and right side, where she had a stroke in 2005. Tr. at 43. She said she had swelling in her ankle, her leg gave out, and she sometimes fell. *Id.* She indicated she was beginning to experience bilateral hip pain because she had been overcompensating with her left hip for the pain on her right. *Id.* She stated her doctor did not yet recommend surgery. *Id.* She testified her back pain was caused by arthritis.

17

*Id.* She indicated she had returned to work following her stroke and had been affected by plantar fasciitis while working. *Id.* She said she sometimes could not tolerate walking because it felt like she was walking on nails. Tr. at 43–44. She noted having to sometimes elevate her feet. Tr. at 44. She denied using an assistive device on a regular basis, but said she would walk with a cane if she felt "real bad." *Id.* She indicated sleep apnea affected her ability to work because it kept her from sleeping at night. Tr. at 45.

Plaintiff testified her eye doctor had recently advised her to reduce her usage of the CPAP machine because it was causing fluid to build up behind her eye. *Id.* She said fibromyalgia caused her to be in pain "a lot" and to "hurt, basically, about all over." Tr. at 45–46. She admitted her medication helped, but did not relieve her pain. Tr. at 46.

Plaintiff stated her "nerves [were] bad" and affected her ability to work. *Id.* She said she had anxiety attacks and took medication for anxiety. *Id.* She indicated she would sometimes lose her temper and did not like to be around people. *Id.* She admitted she continued to take Lexapro and Buspar, but noted she had recently informed Dr. Butler that Buspar was no longer effective. Tr. at 47. She denied receiving mental health treatment. *Id.*

Plaintiff confirmed she was taking medication for hypertension and high cholesterol. *Id.* She indicated she had diabetes, but was not insulin-dependent. *Id.*

Plaintiff testified her pain increased if she sat or stood for too long. Tr. at 48. She said she would lie down for 30 minutes to an hour, three or four times during a typical day. *Id.* She stated her pain increased after sitting or standing for 30 minutes. Tr. at 49. She denied walking for exercise and noted she could only shop in the grocery store for 15 to 20 minutes. *Id.* She estimated she could lift and carry about 10 pounds, as her fingers locked up and her thumb gave way. Tr. at 50. She noted her symptoms were related to a wrist fracture she sustained years prior. Tr. at 50–51.

Plaintiff denied requiring assistance for bathing, dressing, and other self-care. Tr. at 51. She said she would sometimes listen to the radio, watch television, do crossword puzzles, and read the Bible. *Id.* She stated she had difficulty persisting to complete activities. *Id.* She indicated she would wash dishes by hand, cook two or three times a week, wash laundry, and her husband would mop and vacuum. Tr. at 52. She said she visited her grandmother and attended church, where she arrived late and departed early. Tr. at 52–53.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Carroll Crawford reviewed the record and testified at the hearing. Tr. at 53–33. The VE categorized Plaintiff's PRW as a mortgage broker, *Dictionary of Occupational Titles* ("*DOT*") No. 250.257-018, as requiring sedentary exertion and a specific vocational preparation ("SVP")

of 7, and a vocational instructor, *DOT* No. 097.221-010, as requiring light exertion and an SVP of 7. Tr. at 53–54. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, would need to alternate to a sitting position for five minutes per hour, and should avoid workplace hazards. Tr. at 54. The VE testified that the hypothetical individual could perform Plaintiff's PRW as actually and generally performed. *Id.*

Plaintiff's counsel questioned the VE as to the maximum amount of time an individual would be permitted to be off-task in a competitive work setting. Tr. at 54–55. The VE stated employers would generally permit an employee to be off-task no more than 30 minutes, in addition to normal breaks during a typical workday. Tr. at 55.

### 2.    The ALJ's Findings

In her decision dated November 15, 2018, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.
2.    The claimant has not engaged in substantial gainful activity since June 19, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe impairments: fibromyalgia syndrome (FMS), osteoarthritis, right trochanteric bursitis, plantar fasciitis, and calcaneal spurs (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except avoiding work place hazards and the claimant must be allowed the opportunity to sit for 5 minutes every hour.

6.   The claimant is capable of performing past relevant work as a mortgage broker and vocational instructor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from June 19, 2015, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 12–17.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   the ALJ failed to evaluate all the medical opinions in accordance with 20 C.F.R. § 404.1527(c); and

2)   the ALJ did not consider Plaintiff's statements as to the intensity, persistence, and limited effects of her symptoms in accordance with 20 C.F.R. § 404.1529.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.   Legal Framework

1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5)

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant

whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to

---

work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390,

401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

        1.    Weighing of Medical Opinions

The record contains medical opinions from Drs. Butler, Ritterspach, and Laskis. Dr. Butler noted Plaintiff had poor ability to complete complex tasks, adequate ability to relate to others and complete simple, routine tasks, and good ability to complete basic ADLs. Tr. at 603. He wrote: HER ABILTIES TO PERFORM VARIOUS TASKS WILL VARY WITH SEVERITY OF HER SYMPTOMS DURING FLARES, DECREASED ABILITY." *Id.* He further indicated: "HER HEMPLEGIC MIGRAINES ARE QUITE DEBILITATING" such that she "COULD NOT MAINTAIN REGULAR EMPLOYMENT." *Id.* Dr. Ritterspach stated Plaintiff's verbal reasoning and mathematical skills suggested she had "the ability to understand, retain and follow simple, work-related directions," but that "[d]ue to depression," she

"may have mild problems tolerating work-related stressors, and she may be somewhat easily distracted from work tasks if they are detailed and complex." Tr. at 258. He wrote: "Overall, she should be capable of attending to and performing work tasks reasonably well as long as the tasks are simple and routine in nature." *Id.* Dr. Laskis indicated Plaintiff "could understand, retain and follow simple instructions and can concentrate well enough to complete simple tasks w/o supervision, but "would have moderate difficulty with more detailed instructions and complex tasks." Tr. at 89.

Plaintiff argues the ALJ erred in her evaluation of the medical opinions of record. [ECF No. 15 at 5–10]. She claims Dr. Butler's opinion was entitled to controlling weight because it was well-supported and not inconsistent with the other substantial evidence of record. *Id. a*t 5. She maintains Dr. Butler's opinion was consistent with opinions from Drs. Laskis and Ritterspach. *Id.* at 6. She contends the ALJ relied on a singular record, failed to consider all her impairments, and ignored most of the examination notes in concluding Dr. Butler's opinion was not supported by his treatment record. *Id.* at 6–7. Plaintiff further asserts the ALJ replaced her opinion for all the medical opinions of record and failed to properly evaluate the factors in 20 C.F.R. § 404.1527(c) in concluding Drs. Butler's, Laskis's, and Ritterspach's opinions were entitled to "little weight." *Id.* at 8–10.

The Commissioner argues substantial evidence supports the ALJ's allocation of little weight to opinions from Drs. Butler, Ritterspach, and Laskis. [ECF No. 18 at 7]. She maintains the ALJ considered each of the factors in 20 C.F.R. § 404.1527(c) in evaluating the opinions. *Id.* at 8. She contends the consistency of the limitations between the three opinions was of no consequence because the limitations were not consistent with the treatment records. *Id.* at 8–9. She asserts the ALJ did not rely exclusively on one record, but found the entirety of Dr. Butler's record lacked evidence of treatment for depression and hemiplegic migraines and failed to support his conclusion. *Id.* at 9–10. She maintains the ALJ provided sufficient support for her rejection of the opinion that Plaintiff could not perform complex tasks. *Id.* at 10–11. She argues Dr. Butler's opinion did not address fibromyalgia "flares," as he only cited depression and hemiplegic migraines on the form he completed. *Id.* at 11. She contends Dr. Ritterspach's opinion was inconsistent with his findings on exam and Plaintiff's reports of ADLs. *Id.* at 12. She claims the ALJ appropriately gave little weight to Dr. Laskis's opinion because he did not examine Plaintiff and based his opinion on other opinions that were not supported by the record. *Id.* at 13. She asserts the ALJ did not substitute her opinion for medical evidence, but evaluated the medical opinions and relied on the evidence in assessing whether they were supported by and consistent with the record. *Id.* at 14.

The regulations applicable to cases filed prior to March 27, 2017, recognize that treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2); *see also Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017). They include a "treating physician rule," requiring the ALJ to accord controlling weight to a treating source's medical opinion if it is well supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2).

ALJs are not permitted to substitute their own judgment for the opinion of a treating physician on the issue of the nature and severity of an impairment "when the treating source has offered a medical opinion that is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." SSR 96-2p, 1996 WL 374188, *1–2 (citing 52 Fed. Reg. 36932, 36936 (1991)). Nevertheless, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence."

*Mastro v. Apfel*, 270 F.3d 174 (4th Cir. 2011) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

It creates reversible error if the ALJ dismisses a treating source's opinion as not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or inconsistent with the other substantial evidence of record without thoroughly evaluating it in accordance with the applicable regulations. *See* SSR 96-2p, 1996 WL 374188, at *4. If the ALJ declines to give controlling weight to a treating physician's opinion, she must weigh it, along with all other medical opinions of record, based on the factors in 20 C.F.R. § 404.1527(c)(2)(i)–(6). 20 C.F.R. § 404.1527(c)(2); *see also Dowling v. Commissioner of Social Security Administration*, 986 F.3d 377, 385 (4th Cir. 2021) ("While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion.").

If an ALJ declines to accord controlling weight to a treating physician's opinion, she must evaluate all the medical opinions of record based on: how long the source has known the individual; how frequently the source has seen the individual; the degree to which the source presents relevant evidence to support his opinion; how well the source explains his opinion; whether the

source has a specialty or area of expertise relevant to the individual's impairments; and any other factors that tend to support or refute the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(6); SSR 06-03p. She is required to articulate the weight given to these opinions to "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such an opinion may have an effect on the outcome of the case." 20 C.F.R. § 404.1527(f)(2).

The ALJ acknowledged Dr. Butler's opinion, writing:

> The claimant's primary care provider, Dr. Butler provided a medical source statement in January 2016 and indicated the claimant had a good ability to complete basic activities of daily living and had adequate ability to relate to others and to complete simple, routine, repetitive tasks, but that she had poor ability to complete complex tasks. The claimant's primary care provider also indicated in a separate medical source statement that the claimant was unable to work due to migraines. (Exhibit 16F)

Tr. at 15. She noted she considered the opinion pursuant to 20 C.F.R. § 404.1527 and credited that Dr. Butler was "a treating physician with a significant treatment history with the claimant." Tr. at 16. However, she accorded "little weight" to his opinion, explaining "[t]he record does not support Dr. Butler's opinion as his own treatment notes indicate that the claimant only has occasional headaches. (Exhibit 10F/41)." *Id.*

The ALJ summarized Dr. Ritterspach's examination and opinion as follows:

> The claimant underwent a psychological consultative exam in March 2016 to evaluate her alleged anxiety and memory problems. She endorsed depressed mood most days but stated that she stopped working due to her arthritis and bone spurs. She denied any problems with tardiness, absenteeism, remembering instructions, or concentration. She denied conflict with coworkers and supervisors. She did not display severely impaired memory during the mental status exam. The consultative examiner, Chad Ritterspach, PsyD, noted the claimant was able to complete her basic activities of daily living and found that she had the ability to interact appropriately with coworkers, supervisors, and the public but that she would have mild problems tolerating work-related stressors and may be distracted easily from work tasks if they are detailed and complex. He found she was able of attending and performing work tasks reasonably well as long as the tasks are simple and routine in nature and was capable of managing her own funds. (Exhibit 1F)

Tr. at 15. She explained her weighing of Dr. Ritterspach's opinion as follows:

> The undersigned has considered the uncontradicted opinion of an acceptable medical source who had the opportunity to perform a relatively thorough consultative examination of the claimant. (Exhibit 1F) Dr. Ritterspach has a specialty in psychology that makes him qualified to offer an opinion regarding the claimant's mental condition. The undersigned also notes that such an opinion is consistent with the claimant's course of treatment and the findings upon examination. As such, Dr. Ritterspach's opinion is given some weight, but little weight given to his finding that the claimant may be distracted easily from work tasks if they are detailed and complex as there is no evidence of problems with concentration in the treatment records and the treatment records reflect her depression and anxiety improved with treatment following the consultative exam. (See Exhibit 10F)

Tr. at 16–17.

The ALJ also wrote: "The state agency psychological consultants found the claimant had moderate difficulties in maintaining concentration,

persistence, or pace. (Exhibit 5A) Little weight is given to this opinion as it appears to be based upon Dr. Butler's opinion, which the undersigned has given little weight to for the reasons stated above." Tr. at 16.

Additional support for the ALJ's weighing of the medical opinions appears in her explanation for concluding Plaintiff's mental impairments were non-severe. She wrote:

> The claimant also has been assessed with adjustment disorder with depressed mood and bereavement. Her depression is not found to constitute a severe impairment because it is situational and sporadic and it no more than minimally affects the claimant's ability to perform work related activity. The claimant has not sought psychiatric treatment or counseling, and has not been hospitalized o[r] treated by a mental health facility. Additionally, although the claimant has been assessed with depression, this condition has resulted in no more than mild limitations in her ability to understand, remember, or apply information; to interact with others; or to concentrate, persist, or maintain pace; and it has resulted in no limitations in her ability to adapt or manage herself. (Exhibit 1F) The claimant denied any problems with tardiness, absenteeism, remembering instructions, concentration, coworkers or supervisor during her consultative exam and she did not display severely impaired memory during the mental status exam. (Exhibit 1F) The claimant's primary care provider indicated she had poor ability to perform complex tasks due to migraine pain, not due to any mental impairment. (Exhibit 16F) As a result, the claimant's depression has no more than a minimal effect on the claimant's ability to perform basic work activities and is a non-severe impairment.

Tr. at 13.

The ALJ referenced the factors in 20 C.F.R. § 404.1527(c), noting Dr. Butler's treatment relationship with Plaintiff, a lack of supportability in Dr. Butler's treatment notes, inconsistency between the state agency consultants'

opinions and the other evidence of record, Dr. Ritterspach's specialization, Dr. Ritterspach's exam findings, and inconsistency between Dr. Ritterspach's opinion and the other evidence of record. *See* Tr. at 16–17. She provided sufficient reason for declining to accord controlling weight to Dr. Butler's opinion because his treatment notes did not fully support his opinion as to migraines and lacked observations as to Plaintiff's attention/concentration and thought process. *See* Tr. at 308, 313, 318, 397, 419, 428, 433. However, she failed to comply with 20 C.F.R. § 404.1527(c) insomuch as she did not consider all the relevant factors with respect to each opinion and ignored evidence in assessing the supportability and consistency of the opinions.

The ALJ failed to adequately evaluate the supportability of Dr. Butler's opinion in accordance with 20 C.F.R. § 404.1527(c)(3). "The more a medical source presents relevant evidence to support a medical opinion" and "[t]he better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). The ALJ rejected Dr. Butler's opinion as contrary to his treatment notes regarding Plaintiff's headaches, but failed to address his remarks within the opinion form as to limitations to mental status imposed by major depression. *See* Tr. at 13, 16. Dr. Butler's opinion does not support the ALJ's assertion that his impression of poor ability to complete complex tasks was due to migraine pain. *See* Tr. at 603. Although Dr. Butler indicated Plaintiff's

hemiplegic migraines were "QUITE DEBILITATING" and would prevent her from "MAINTAIN[ING] REGULAR EMPLOYMENT," he identified her mental diagnosis as major depression before indicating she had poor ability to complete complex tasks. *See id.* He supported this opinion with mental status impressions of slowed thought process, depressed mood/affect, and fair to poor attention/concentration. *See id.* While the ALJ explained her finding that Plaintiff's mental impairments were non-severe, she did not reconcile her conclusion with Dr. Butler's mental status impressions, which could reasonably support an inability to complete complex tasks. *See* Tr. at 13. In addition to the abnormal mental status findings on the form, Dr. Butler consistently described Plaintiff as having a somewhat sad affect throughout his records, *see, e.g.*, Tr. at 308, 313, 318, 397, 419, 428, 433, but the ALJ only noted such an impression in June 2015. *See* Tr. at 15. The ALJ failed to address how a consistently sad affect could reasonably limit Plaintiff's ability to complete complex tasks.

The ALJ's evaluation of Dr. Ritterspach's opinion reflects similar error in the supportability analysis. The ALJ failed to reconcile Dr. Ritterspach's findings that Plaintiff had some difficulty completing serial threes and recalling words after a delay. *See* Tr. at 258. She also ignored Dr. Ritterspach's explanation that Plaintiff's verbal reasoning and mathematical skills supported his opinion. Dr. Ritterspach's observations as to Plaintiff's

34

deficits in recall, memory, verbal reasoning, and mathematical skills could reasonably support the opined restriction to simple, routine work tasks.

The ALJ also erred in evaluating the supportability of the state agency medical consultants' opinions. Her finding that the consultants' opinions were based on Dr. Butler's opinion is not supported by a review of the consultants' opinions. Dr. Laskis specified the restrictions he assessed were based on Dr. Ritterspach's consultative exam, as it appeared consistent with the clinical findings and comprehensive medical records. Tr. at 67. He stated the weighted medical evidence supported a severe, but not listing-level impairment, with mild limitation in maintaining social functioning and moderate limitation in concentration, persistence, or pace. *Id.* Dr. Robbins agreed. *See* Tr. at 66–67, 71–72.

The ALJ ignored the consistency of the medical opinions, as all three medical sources opined that Plaintiff could perform simple, routine tasks, but would have difficulty performing complex tasks. *Compare* Tr. at 89, *with* Tr. at 258 *and* Tr. at 603. The ALJ's explanation for assessing Plaintiff's mental impairments as non-severe does not provide sufficient reason for her failure to reconcile the consistency of the opinions. *See* Tr. at 13. Plaintiff's lack of specific psychiatric treatment, counseling, and hospitalization does not demonstrate she is able to perform complex tasks. Her denial of problems with tardiness, absenteeism, remembering instructions, concentration,

coworkers, or supervisors during past periods of employment does not show a lack of problems following her alleged onset date. *See* Tr. at 289. Although Plaintiff "did not display severely impaired memory during the mental status exam," Tr. at 13, she demonstrated some impairment that supported a restriction to simple, routine tasks, according to Dr. Ritterspach. *See id.*

The restrictions for simple, routine tasks would have effectively limited Plaintiff to unskilled work. *See* 20 C.F.R. § 404.1568(a) (defining unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time"); 20 C.F.R. § 404.1568(b) (defining semi-skilled work as "work which needs some skills but does not require doing the more complex job duties"); 20 C.F.R. § 404.1568(c) (defining skilled work as "requir[ing] qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced" and jobs that "may require dealing with people, facts, or figures or abstract ideas at a high level of complexity"). If the ALJ had credited the medical opinions, the applicable SSR would have required she conclude Plaintiff was unable to perform her PRW, as the VE characterized it as skilled with an SVP of 7. *See* Tr. at 53–54; *see also* SSR 00-4p (noting "unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the *DOT*"). Given Plaintiff's age and

education, the Medical-Vocational Guidelines would have directed a finding of "disabled" if Plaintiff could not perform her PRW and had a maximum RFC for light work, as assessed by the ALJ. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 2 §§ 201.06, 202.06.

The court must remand this matter because the ALJ failed to apply the proper legal standards in evaluating the medical opinions of record and the disability finding turns on Plaintiff's ability to perform skilled work.

### 2.    Subjective Symptom Evaluation

Plaintiff argues the ALJ failed to consider subjective evidence of her symptoms in accordance with 20 C.F.R. § 404.1529 and the Fourth Circuit's holding in *Arakas v. Commissioner*, 983 F.3d 83, 95–96 (4th Cir. 2020). [ECF No. 15 at 11–13]. She maintains the ALJ erred in citing "no significant musculoskeletal swelling" and "full strength [on exam]" to support a finding that her complaints of pain were not supported by the record. *Id.* at 12–13. She further contends the ALJ ignored documentation of tender points that supported her fibromyalgia-related complaints. *Id.* at 13.

The Commissioner argues the ALJ properly applied the two-step analysis and relied on the regulatory factors in 20 C.F.R. § 404.1529 in evaluating Plaintiff's subjective allegations. [ECF No. 18 at 16]. She maintains the ALJ's analysis differs from that in *Arakas* because she recounted Plaintiff's testimony as to the effects of fibromyalgia, thoroughly

considered the evidence of record, accounted for her limitations in the RFC assessment, and was not required to discuss every piece of evidence. *Id.* at 16–18.

The ALJ must consider evidence of a claimant's pain and other symptoms in accordance with the rules in 20 C.F.R. § 404.1529 and Social Security Ruling ("SSR") 16-3p. "Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)).

Special consideration is required if fibromyalgia is among the claimant's severe impairments, as courts have recognized that fibromyalgia "symptoms are entirely subjective," and "[t]here are no laboratory tests for the presence or severity of fibromyalgia." *Arakas*, 983 F.3d at 91 (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). Physical examinations generally yield normal results, such as full ROM, no joint swelling, normal muscle strength, and normal neurological reactions. *Id.* at 96. Pursuant to SSR 12-2p, a claimant may meet either of two sets of criteria to establish and confirm a diagnosis of fibromyalgia, the 1990 American College of

Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia or the 2010 ACR Preliminary Diagnostic Criteria. If the claimant establishes a diagnosis of fibromyalgia as a medically-determinable impairment under either set of criteria, the ALJ should proceed to the second step.

The second step requires the ALJ to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. § 404.1529(c)). This requires the ALJ to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). Other evidence relevant to the evaluation includes: "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel"; the claimant's ADLs; the location, duration, frequency and intensity of the claimant's pain or other symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measure the claimant uses or has used to relieve pain or other symptoms; and any other factors

concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *6. The ALJ must explain which of the claimant's symptoms she found "consistent or inconsistent with the evidence in [the] record and how [her] evaluation of the individual's symptoms led to [her] conclusions." SSR 16-3p, 2017 WL 5180304, at *8.

The ALJ found the claimant's medically-determinable impairment of fibromyalgia could reasonably be expected to cause her alleged symptoms, but concluded her statements as to the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical and other evidence. *Id.* at 12, 14. She acknowledged Plaintiff had a "history of fibromyalgia treated with anxiolytic medication by a rheumatologist." Tr. at 14. She addressed Dr. Dayal's treatment as follows:

> Her rheumatologist, Ashrito Dayal, MD, noted that her symptoms and clinical findings regarding her generalized osteoarthritis of the lumbar spine, knee joints, and hands were minimal in September 2015, but noted the claimant possibly had a secondary fibromyalgia. Dr. Dayal recommended daily exercise, stretching, and walking and prescribed Lexapro. (Exhibit 6F) She reported her fibromyalgia was better on her new regimen of Lexapro in October 2015. (Exhibit 4F)

Tr. at 15. She discussed subsequent treatment, writing:

> The claimant reported to Dr. Dayal that her depressive features had improved. On exam she had a few scattered tender points over her neck and back, but she continued to have full strength throughout. (Exhibit 13F) He found in November 2017 that the claimant's chronic musculoskeletal pain/fibromyalgia remained

> stable with Lexapro, that Dr. Dayal had suggested that Dr. Butler take over prescribing Lexapro and that the claimant only needed to follow up with Dr. Dayal if she developed new symptoms. (Exhibit 10F)

Tr. at 15–16.

After summarizing the evidence, the ALJ provided the following explanation:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are not consistent with treatment records that reflect her impairments are stable and her symptoms generally managed with treatment. The claimant does have complaints of various aches and pains throughout the medical evidence of record, but overall the medical evidence of record just does not support her allegations of debilitating impairments. Her treating providers are treating her conservatively [with] medication and supportive footwear. (Exhibit 10F) There is no evidence of medical necessity for hand held assistive device for ambulation. She has not been hospitalized for any of her impairments. She presented to the emergency room a few times for plantar fasciitis, but continues to have a normal gait. (Exhibit 11F) She uses her CPAP for her obstructive sleep apnea and reported she was doing "excellent" to her primary care provider. (Exhibit 11F) Her primary care provider does prescribe medication for anxiety and depression, but she has reported that she is "doing well" with that and her mental status exams are consistently normal. (Exhibit 10F/30) Her primary care provider has not recommended that she seek psychiatric or professional mental health care for either her anxiety or depression.

Tr. at 16.

The record generally supports the ALJ's finding that Plaintiff's fibromyalgia symptoms improved and stabilized on Lexapro. After Plaintiff restarted Lexapro in late-2015, she reported improvement. Tr. at 285, 287,

306. In August 2016, Dr. Dayal doubled Plaintiff's Lexapro dose to address her increased symptoms. Tr. at 281–82. However, despite improvement and stability of Plaintiff's symptoms, she continued to endorse diffuse pain throughout her body, consistent with fibromyalgia. Tr. at 287, 582.

Although the ALJ acknowledged Plaintiff's "complaints of various aches and pains throughout the medical record," she erroneously sought objective evidence to support Plaintiff's allegations of fibromyalgia-related pain. The Fourth Circuit recently acknowledged "[a] growing number of federal circuits have recognized fibromyalgia's unique nature and have accordingly held that ALJs may not discredit a claimant's subjective complaints regarding fibromyalgia symptoms based on a lack of objective evidence substantiating them." *Arakas*, 983 F.3d at 97 (citing *Johnson v. Astrue*, 597 F.3d 409, 412, 414 (1st Cir. 2010); *Green-Younger v. Barhart*, 335 F.3d 99, 108 (2d Cir. 2003); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *Sarchet*, 78 F.3d at 307, *Brosnahan v. Barnhart*, 336 F.3d 671, 677–78 (8th Cir. 2003); *Revels v. Berryhill, 874 F.3d 648, 666* (9th Cir. 2017). It "join[ed] those circuits by holding that ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." *Id.* The court noted "[o]bjective indicators such as normal clinical and laboratory

results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease." *Id.*

Here, the ALJ indicated Plaintiff's PCP had observed "no significant musculoskeletal swelling" and Dr. Dayal noted "full strength throughout," Tr. at 15, "effectively requir[ing] 'objective' evidence for a disease that eludes such measurement." *See Arakas*, 983 F.3d 96 (citing *Green-Younger*, 335 F.3d at 108). While she credited Dr. Dayal's observation of "a few scattered tender points over her neck and back," Tr. at 15, the ALJ did not acknowledge his consistent notations of tender points, "the only 'objective' signs of fibromyalgia," *id.* (citing *Brosnahan*, 336 F.3d at 678; *Johnson v. Astrue*, 597 F.3d 409, 412 (1st Cir. 2010)). *See* Tr. at 282, 285, 288, 291, 294, 583.

The ALJ erred in citing Plaintiff's conservative treatment history and lack of hospitalization as inconsistent with her allegations as to the effects of fibromyalgia. Although SSR 16-3p permits an ALJ to conclude the intensity, persistence, and limiting effects of a claimant's impairment are not as great as she alleged "if the frequency or extent of the treatment sought . . . is not comparable with the degree of the individual's subjective complaints," an ALJ cannot fault a claimant "for failing to pursue non-conservative treatment options where none exist." SSR 16-3p, 2017 WL 5180304, at *9 (citing

*Lapierre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010)). The record contains no evidence to suggest Plaintiff failed to follow more aggressive treatment for fibromyalgia-related symptoms or that any such treatment was available, which is not surprising given the nature of fibromyalgia. Furthermore, the nature of fibromyalgia does not lend itself to frequent hospitalization.

Because the ALJ failed to apply the proper legal standards in evaluating Plaintiff's statements as to the intensity, persistence, and limiting effects of fibromyalgia-related symptoms, remand is required.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

March 17, 2022                              Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge